The next case today is Roberto Vazquez-Ramos v. Triple-S Salud, Inc. et al. Appeal Number 21-1115. Attorney Martinez, please introduce yourself for the record and proceed with your argument. Good morning again, Jorge Martinez for Diapolans. Your Honor, may we set aside three minutes for rebuttal? Yes. Thank you, Your Honor. This is a restraint of trade case in the context of Puerto Rico's medical insurance for the needy, specifically for western Puerto Rico in the provision of urology services. And it's a refusal to deal not among competitors in the urology market, but a vertical restraint from the insurance company that had the exclusive rights over the region and a particular physician. And they entered into an exclusivity deal. And since it is a vertical restraint, it is not a per se violation of the Sherman Act. We need and we have always understood that we need to persuade the court under the rule of reason. Under the rule of reason, the plaintiff has the initial burden of establishing that there is substantial anti-competitive conduct that harms consumers in the relevant market, which we respectfully believe we did in our pleadings in the amended complaint. However, that second part of the rule of reason probably brought on the ruling that has been challenged before the court. And I explain myself. We had to argue that not only that our providers for the Mi Salud program, but we had to establish that that harmed the consumers in the relevant market, which is the patients that over 200,000 patients in that market. And in doing so, the court found that it was the patients who might have had standing to sue under the Sherman Act and to challenge the exclusivity deal that left them with just one urology provider for that whole population. And we posit that it is crystal clear from the pleadings that there is anti-competitive conduct, because before the exclusivity deal and as per the relevant Puerto Rico law, there were several providers, which were my clients, along with the defendant, Rodrigo Velasquez, and his corporations for urology services, and they competed in that market. And the exclusivity deal obliterated that market, harming the patients, of course, in matters such as geographic locations, unavailability of urologists in several hospitals with clinical privileges. So certainly, as competitors that were unable to compete after the exclusivity deal, they certainly have standing independent of whatever standing the consumers might have had to bring an antitrust claim. Can I ask you, I want to understand what happened here. I understand that this idea of having an have one company provide all of the urologic services in western Puerto Rico. Well, actually, it is on the pleadings, and it is part of the initial agreement between Triple S that that was not the reason. Actually, there is a stipulation in the exclusivity agreement between Rodrigo Velasquez and Triple S to have prostate cancer patients just undergo one particular type of treatment that is less expensive than chemical castration, in which Triple S would split the savings with this urologist. In terms of the deal, who drove this? Triple S, I'm assuming, has some market power as the urologist. It was delegated by the government to be the sole insurance company handling that population at that time. So why would Triple S, as the purchaser of urologic services, want to do anything that would increase the price of urologic services? Well, as I was explaining, actually, part of the agreement was that urologist was willing to recommend for certain cancer patients certain type of treatments that are not as expensive, and they would be splitting the savings. So actually, there were savings that were contemplated because of that agreement. In other words, the deal was lowering the cost to the purchaser of urologic services in western Puerto Rico? Yes. As a matter of fact, it was discouraging patients. For instance, western Puerto Rico, the region, if you look at Puerto Rico's map, the westernmost part, to the north, you would have San Sebastián, the town of San Sebastián, to the south, the town of Lajas. It's several towns, and this physician only had medical privileges in a single hospital in Maya West, which is smack in the middle of the region. But stay with the economics here, because when we have a vertical restraint, we need to consider weighing the competitive benefits and the competitive harms. I'm trying to get at the harms. How is lowering price in the seller's market, how does that harm purchasers? I'm trying to see what the competitive harm is. I understand you have a separate argument that consumers may be hurt by inadequate services of some type, and we can get to that, but you guys are in the market of selling services. I'm not seeing where the antitrust injury is or the incentive to create an antitrust industry in that market would be. Well, Your Honor, there's actually no savings to SSS, because SSS gets a capitation from the government to administer the health insurance for over 200,000 lives, and they get that very same capitation that they need to distribute and to provide, by law, a freedom of choice of physicians. Under the law, each patient must choose between what provider they want. Actually, SSS is not spending its own money in this scheme. It has a fiduciary duty to money that it receives from the medical insurance plan from the government, so there's no savings for SSS. Suppose a urologic service cost $1,000 before, and then SSS does this deal where they get a quantity discount for giving exclusive services, and now a urologic service is charged at $900. Aren't they $100 better off? Yes, but that's not what happened in this case, and as a matter of fact, SSS is not paying with its own money, so SSS is not saving anything. SSS is distributing... Well, no. Stay with that. Now you're confusing me on that. SSS gets money for a capitation fee. It makes money by having the expenditures total less than the total capitation fees. Otherwise, it'd be out of business. Yes. Four minutes remaining. Regardless of this exclusivity deal, there are X amount of patients in western Puerto Rico that are covered by MiSalud, and when those patients need urological services, they need to go and SSS needs to pay for their services, so there's no savings there, because the population that needs urologic services, be it because they have prostate cancer, they have any other urological condition that are covered by the MiSalud insurance, they're still going to be sick, they're still going to need urologies, only that they now have just one choice, so there's no savings for SSS. There is no business reason to do this. Why SSS does this? And what's the theory of why SSS does this? Our theory of why SSS does this is because it does not want to provide certain services that are supposed to be provided, and it makes it less likely that patients go to get urology services if they only have one urology provider that can hospitalize them only in one hospital in Mayaguez, later two hospitals in Mayaguez, so they dissuade sick individuals, ill individuals from getting the services that they need because it's not feasible for them to go to the urology, so that's not a legitimate reason. You don't save money by not providing services and limiting the market in that way. That is anti-competitive conduct if we've ever seen it. So if I may, Mr. Martinez, is there evidence in the record about this parsing of available services by SSS? The theory that you've just offered to Judge Kayada that there's a glancing relationship to antitrust injury. Is there any evidence in the record that they don't like to provide prostate services in certain parts of western Puerto Rico? Your Honor, first of all, when you talk about evidence, this is a Rule 12b6 motion. This is on the pleadings. Well, I'm sorry. I shouldn't have put it in that way. Can I find on the pleading that you've provided here? Yes, Your Honor. We're saying that. Yes. Paragraph 3.20 and 3.21 of the amended complaint. Paragraph 3.21 specifically, and I'm quoting here, says, defendants entering through their monopolistic arrangement, the number of prostate cancer patients treated by Rodriguez-Vlasquez urologists that have been physically castrated in lieu of more effective and more expensive drug treatment has increased, resulting to an inferior quality of life for these patients, et cetera. On the previous paragraph, 3.20, is where we talk about the agreement that the insurance company had with the physician that this specific limitation on treatment would be provided. Moreover, the complaint alleges that SSS had to get a bigger hospital in Mayaguez to grant clinical privileges to this doctor, and that hospital wants to strip those privileges because subpar services were being provided and the medical population that intended to. So, yes, those pleadings are there. Well, maybe I can ask you to focus a bit more on Judge Callada's question because it seems to me that you're weaving back and forth between standing of patients and the anti-competitive quality of this. That comes very close, it seems to me, suggesting that you're appearing here on behalf of the patients. No, you're not formally, but the question is whether or not those allegations really are allegations that are of benefit to the patients, not to you. The injury that I'm claiming for my clients is that my clients were competitors of the defendants. They were in that market and for legitimate reasons such as their prestige, their physical locations, their competitiveness, the patients could choose in that market whether or not they wanted the defendants or they wanted any of my clients to be their providers. Once this exclusivity agreement was signed, there's no competition. Competition was obliterated. My clients cannot compete in that and that is our injury, which was confused with respectfully believed by the district court and by some of the defendants when they point to other allegations in the complaint in which we state which are the economic damages that we're seeking as tribal damages. But that is different from the injury that we're alleging, which is we were competitors in this market and we were excluded by that market through anti-competitive behavior that hurt the consumers and that is what the Supreme Court has stated needs to be established under the rule of reason, particularly at the pleading stage. We respectfully believe that other details could be probed further in discovery, but we were not given the opportunity and we cannot think of a more clear obliteration of competition. Okay, counsel, you've reserved some time. Thank you, your honor. Thank you, attorney Martinez. Please mute your camera and audio and attorney Roman, please introduce yourself on the record. You have a five-minute response. Good morning, your honors. I need to please the court. My name is Luis Roman and I'm appearing on behalf of picking up on a question made by Judge Calleja. The assertion by appellants that SSS has nothing to lose by not administering the monies that the government provides under this competition agreement is incorrect. We have to properly frame how this arrangement works. The appellants do not contest that this is a vertical relationship, namely an exclusive services agreement between an insurance company and a medical services provider in which the insurer is the buyer of services. This is an arrangement made within the government health program, which works based on a model of managed care, which means that the insurance company is assigned a certain amount of money based on a PMPM basis, per month per member basis, and the insurance company then has to engage and contract other providers. We have under contract and under the regulations of SSS, which is the government agency that regulates the program, we have to meet several requirements. For instance, we have medical loss ratios that we have to meet. We have to employ a certain amount of money for medical services. We are also limited on the amount of money that we can make. As Judge Calleja pointed out, this is a business and under the regulations, we are here to make a profit. The profit is limited on a percentage basis. If SSS does not wisely administer the monies assigned by SSS, then we lose money. It is in our interest to wisely use the competition provided. It is incorrect to say that we have nothing to lose here or that our situation does not change at all, regardless of how we use this. The managed care model has been addressed by the court previously. In a vertical arrangement, it has been held to be a valid method of contracting. As long as you use wisely the money, it does not have any anti-competitive implications. Under Section 1, which is how the appellants are basically— I believe Judge Keada has a question. So you make very on-point arguments for the competitive analysis and the balancing, but let me ask you a procedural question. What is your best case for the proposition that you have an admittedly exclusive dealing relationship between the buyer of services and the seller of services, pursuant to which the buyer of services agrees it will not deal with the seller's competitors? What is your best case for saying that that type of vertical arrangement can be blessed under a rule of reason analysis on a 12B6 motion? Yes, Your Honor. Although appellants use the term restraint of trade, refusal to deal, and boycott loosely, the real thing is that under First Circuit case law and Supreme Court case law, vertical arrangements which do not contain or which do not include competitors are not held to be— Could you please answer the question? What is your best case that at the motion to dismiss stage, where there's exclusive dealing, which includes a requirement of excluding all of the competitors, which the plaintiffs actually are, what is your best case that that can be dismissed at the 12B6 stage? Yes, Your Honor. The best case is that the What is the case? Cite us a case. If you look at our precedent in the Evergreen case, it quite discourages these sorts of motions to dismiss under rules of reason, vertical or horizontal cases. Yes, Your Honor. Different than in the Evergreen case, the Evergreen case, the plaintiffs, even though they were not direct competitors, they affected the defendant's business. There is no way under—even taking all the allegations as true, how— Mr. Roman, can I make it three, which is all three of us would like to know a case that we can look at that distinguishes Evergreen, if that's what you're trying to do, that hopefully comes from the First Circuit, but in any event addresses this question of perhaps the implications of Twombly in dealing with antitrust allegations. A case. A case which is similar to this one. We have not found a squarely unbiased case, but we do—it is our position that Evergreen is clearly distinguishable because of the fact that a plaintiff, even though it was not a direct competitor, it produced a product that affected the defendant's market. In a way, it was an action by the defendants to squeeze out or to exclude a product that affected their business. Similarly, although it's not squarely on point, the U.S. healthcare case from the First Circuit does state that arrangements such as this one are not a boycott, are not refusal to deal, because they are—refusal to deal and boycott cases are— Was U.S. healthcare a summary judgment case or a motion to dismiss? Yes, it was not a pleadings case, but the general framework of what is fundamentally a boycott or refusal to deal, it was specifically laid out in that case and the First Circuit held that boycotts are horizontal arrangements generally and refusal to deal cases as well. We're here and the appellants do not contest that we are before a vertical arrangement, so there is no way even taking all allegations as true that this framework— I have a different question. Your brother said basically that one of the artifacts of this patients could get healthcare and to restrict the type of urological services they could get, that there were a great deal more chemical castrations rather than drug treatment for, I assume it's testicular cancer and the like. In most vertical dealing cases, the product remains the same. Here, the product is said to have been altered rather a lot, both as to availability and as to the type of products that are being offered, but your brother went even further and said that this redefinition in the course of the exclusive dealing is actually contrary to Puerto Rico law and is a kind of separate illegality which is being violated. It may not be fair to ask you, but is there an argument that there is a violation of either Puerto Rican or federal law in the restriction of available services? Yes, Your Honor. I will begin by answering the last question, whether there's a violation of the regulation. The answer is no. Although the Assess Organic Act does state that the consumers have a right to choose between providers, those same regulations state that—actually encourage the insurance companies, the MCOs, to engage in managed care arrangements such as this one, which results in cost savings. How do the provisions work out? It is a matter of law. I'm sorry. You've addressed the choice of providers, and my question was more the restriction of types of urological services that are available when, in fact, best medical practice might suggest that as a result of the exclusive dealing agreements, best medical practices as to types of remedial treatments are no longer being made available. I had thought that Medicare is extremely complicated, but I had thought there were some requirements about providing a range of services consistent with best medical practices. Yes, Your Honor. The appellants do state in the allegations in the complaint that there was some use of castration instead of chemical castration. At this stage of the proceeding, this is not the stage to contradict that or not, but even assuming— You see, that's part of the point about the 12B6 as opposed to summary judgment. Yes, but even accepting that as true, as the district court correctly ruled, the better plaintiffs to claim under that theory are the consumers, not the providers. So your average consumer, your patient who's suffering from urological problems is more likely to undertake to sue the insurer because they're not getting quite the services they want or the doctor they want. In the real world, that's not likely to happen. Your Honor, under Puerto Rico, there are several ways in which patients could raise their concerns against the medical, even at the agency level, before the courts. But for purposes of an Sherman Act case, the First Circuit case law is clear that there are some favored plaintiffs, and providers in this specific structure are not favored plaintiffs, as the district court correctly ruled.  Thank you. At this time, Attorney Roman, if you could please mute your audio and your video. Attorney Yaddo, please introduce yourself on the record. You have a five-minute response. Good morning, Your Honors. May it please the court. My name is Ivan Yaddo. I represent APELI, MSO of Puerto Rico. Your Honors, in this case, only three plaintiffs bring claims against MSO. MSO is a delegated entity of MMM Healthcare, which is a Medicare Advantage organization. So, we are here in a different context than the allegations against SSS and the doctor. Now, I'll go through three points here, antitrust injury, the Section 1 claim, and the Section 2 claim. And I want to make a point on the proposed relevant market as allowed by the district. Now, as to antitrust injury, plaintiffs have not alleged harm to competition. They admit that MMM is but one of the Medicare Advantage insurers that purchase urology services in the West. Now, contrary to the... Can I back up on that? I thought that the allegations fairly read that your client is the primary source of Medicare Advantage and that the district court was in error when it said there were many other sources. I understood them to be making both of those assertions. Are those untrue? Your Honor, the allegation is that we are one of the largest MA insurers in Puerto Rico. One of the largest. Okay. All right. So, you don't have to be the exclusive provider and you don't escape antitrust liability merely because you're not the exclusive provider. Largest providers can, in fact, exercise monopoly power. And we're just at the motion to dismiss stage. Who knows what percentage of the market you actually have. All right. So, let's move on to your next couple of points, unless you have a response on that you'd like to give us. Yes, Your Honor, I do. It's true that we are just one of the largest and our position, Your Honor, is that this is not enough to conclude that there's been substantial foreclosure based on the general allegation that we are one of the largest. First of all, they say we are one of the largest in Puerto Rico and the relevant market is the Medicare Advantage market in the West. And they don't even allege we have the most enrollees in the MA market in the West. So, even their general allegation doesn't help them. In addition, alleging that we are one of the largest MA insurers means, of course, that there are other MA insurers just as large, Your Honor, and they do not allege that they've been foreclosed from where they hang their hat, Your Honor, but they have nothing else. It's not enough for the court to, even assuming the fact is true, to conclude there's been substantial foreclosure. Of course, the allegations against your client and the exclusive dealing with this particular doctor are essentially parallel and the same as against SSS. And the thing that is that you don't have an exclusive, you're not the exclusive provider, although who knows, you may be the 98% provider in the West. We simply don't know. So, I take your, they should have pled market better than they did. Is that an adequate basis to dismiss at this point? Yes, Your Honor. And we have not submitted to this court that statistical data was necessary, as the district court ruled, that it would be too much to ask for statistical data. That's not what we're saying. But based on the one allegation that we are one of the largest it's simply insufficient, based on that allegation, to conclude that we have been able to curtail competition. And that's without entering into- I know, but you see, it's tied with the exclusive arrangement. It's not just you're one of the largest, you're one of the largest and you've entered into an exclusive arrangement, the typical, well, atypical, vertical, possible violation of the antitrust laws. If I may, a couple of points on that, Your Honor. First of all, Medicare Advantage organizations, of course, are authorized under Medicare regulation to establish their own network of providers. These do not have to be open networks, right? So, that's the first thing that I want to point out. The second thing, they even allege that- and remember, we hired here a group. We didn't hire one doctor. We hired a group of providers. And they even allege at a certain point that Eurologix was trying to bring them into their own group. So, there's no allegation here as to how they were foreclosed from the market, Your Honor. And that's very important. So, can we go to the allegations about medical services that ordinarily would have been provided are not being provided because of the exclusive group? And let me ask the same question. Isn't there in Medicare Advantage law some requirement that you actually provide the services that are medically indicated for patients? Your Honor, we cite to the regulation that talks about network adequacy, which includes adequate services. So, MAOs are authorized to establish these networks necessary to provide adequate services to attend the population. And CMS supervises the MAOs. As Your Honors know, Medicare Advantage is the same as Medicare, except it's private insurers. Here, CMS regularly supervises and ensures that compliance is met as to the adequacy of the networks. So, what you're saying is, if that's really what they're concerned about, they ought to go make an administrative complaint to CMS and not an antitrust action? Is that the bottom line? That's correct, Your Honor. They are not the entity here in a highly regulated industry. They are not the regulator. Do you have any other questions? No, go ahead. Your Honor, speaking about the standard that we are in the pleading stage, Your Honor's case in Morales-Villalobos, where it was decided on the pleading stage, is drastically different. There, you had a plaintiff that said, listen, I operate, I can only provide services in only two hospitals, and I've been completely shut out. I can't even provide in a neighboring municipality. So, all outlets, I think it was reasonably available to the plaintiffs she was shut out from. And that's why this court allowed the case to proceed. We're not even close. And I want to make an additional point here as to the proposed relevant market. And the court need not rule on this because we think we win on the other points. But MSO and Neurologics disagree with the district court's proposed market as allowed. The court said that the market was the Medicare Advantage market in the West. Now, this court in Stop-and-Shop said that an exclusive dealing claim by a shutout supplier, the market definition has to include the available market for the supplier. So, that means other sources of interchangeable demands. So, for example, we have argued that this would have to include, like, for example, Medicare. Medicare is exactly the same program, except not administered by the MAOs. You also have commercial plans. You have any other type of health plan. Why have they not been excluded? You have no shutout in this case. And that's because plaintiffs narrowly defined the market as a Medicare Advantage market. And on this point, while the court allowed them to proceed with the they haven't responded to our point on why the market cannot include all these other outlets available to them where they can sell their services to. Okay, help me with this because I may have misunderstood. I thought the point of the Western Massachusetts market was that neither doctors nor patients in Western Puerto Rico, I may have misspoken, Western Puerto Rico are unlikely to end up in San Juan for delivery of services or receipt of services. You haven't addressed that. Your argument seems to be, oh, there are other providers, and therefore, the market definition was wrong. Have I misunderstood? Yes, Your Honor, it would be other buyers of the services that they have. There's other buyers or purchasers here. In this case, you have Medicare. You have Medicare patients. You also have commercial private health plans. You even have patients who pay out of pocket. So what our position is, plaintiffs didn't address how or why these cannot be included. Why aren't these sources of interchangeable demand here? Because Medicare Advantage payments, by definition, are very poor. That would be one argument which they didn't make. But what about traditional Medicare, for example? Why aren't those sources of interchangeable demand? Maybe you better tell us more about the Medicare Advantage program and why it exists on top of normal Medicare. It's basically the same. Medicare Advantage offers another chance to provide Part A and Part B of Medicare, but it's done by who are able to qualify, 65 years of age or older, and write on other categories of patients. Okay, so it's an older population. Yes, Your Honor, that's correct. Okay. If Your Honors have any other questions? No, but thank you. That's been helpful. Thank you, Your Honor. At this time, Attorney Yaddo, if you could please mute your audio and your video. Attorney Alcover, if you could please introduce yourself on the record to begin. Thank you. Good morning. May it please the Court? I'm Cesar Alcover. I represent Dr. Rodriguez and his entities. I would like to devote some time on the primary exclusive jurisdiction issue argument that was presented before the District Court. But before I do that, I would like to the Court two things. Number one, that only two plaintiffs are making allegations against our client, which is Javier Colon and Luis Muñiz, because the other plaintiffs are addressing their claims against MSO. And number two, that there is no Section 2 claim against my client, Dr. Rodriguez and his entities. Having said that, the allegations involving my client are under the state Medicaid plan, which is basically the Medicaid program, which is a highly regulated program, which encourages the creation of preferred provider network, PPNs. And we saw to the Court, based on the law and the Regulation 9068 of SS, that this is something, these exclusivity contractual arrangements, this is something that this system encourages, not only under Puerto Rico law, but the CMS law as well. And being highly regulated, Judge Lynch, in your case of Royal Melesio that you authored in 2005, you indicated that in this type of antitrust claims, the best plaintiffs are the customers, the consumers, who are alleged to have suffered damages. And operating the complaint, throughout the amended complaint, the plaintiff's theory regarding injury to competition is harm to the patients. And it is scattered throughout the amended complaint. If we were to group… Can I ask a question? Sure. Suppose they amend the complaint and they add a patient, one patient, it doesn't really matter how many they add. Are you saying that the case should be dismissed in any event? It would have been dismissed as well, because under the exclusive primary jurisdiction, that patient should go through the state Medicaid SS, which has the whole scheme of adjudicating, receiving complaints, adjudicating and auditing services. I was about to say that if you group the allegations of alleged harm to patients, you could make three groups. Access to services, quality to services, and provided misconduct. That's basically what they are alleging throughout the complaint. Taking together the law of SS, as well as the regulation, SS has the supervised access, sufficiency of the network, which is something that they are alleging here, and the quality of services. And the allegation that in which your Honor stopped Brother Counsel and made several questions, which is basically the increase in physical castration as opposed to chemical castration. Both are accepted methods of providing services. They are accepted in the science. The only allegation is that one type was performed as opposed to the other. I'm sorry. Are you asserting that any competent doctor would say the two are quite equivalent? Surely, one is preferred on certain symptoms over another. Well, yes. As reasonable doctors, we could defer and say one is preferred as to the other, or one patient needs one versus the other. But that is not an antitrust injury. That's not an allegation that violates the antitrust statute, which plaintiffs are trying to portray something that, because the physical castrations increase, there's somehow a violation of antitrust laws, which is not the case. Going back to the statement... The antitrust law is a concern more than price. It affects competitive effects on price and quality as well. I think a better position is that that's not an issue on which these people have standing, these plaintiffs. Well, there's no allegation in the amendment complaint that the prices have increased. To the contrary, they are admitting that there was the vertical arrangement has created savings that somehow are being shared between the defendant, Dr. Rodriguez, and Triple S. There's nothing wrong with that. They are not alleging that there has been an increase in prices. The whole allegation is based upon alleged harm to the patients. Can I follow that, please? The question had to do with anti-competitive effects on the quality of the product as well. Now, suppose that the insurers will only pay for chemical castrations and that the plaintiff group includes doctors who would not ordinarily simply prescribe the chemical castrations. They would prefer drug therapy. If those don't work, then you move to chemical castrations. Only, they can't survive because they're not going to get any patients for the type of treatment that they provide because of the exclusive dealing arrangement with the only they're not going to be able to survive in their practices. Any patient where in the western Puerto Rico area, your honor, because as the complainant is written, this plaintiff, they have a license to work throughout Puerto Rico and they have not alleged that they have been curtailed from providing services in other areas of Puerto Rico. It's kind of like immigration. You move to some other area of the country where you're not under threat of death. Let me tell you this. In the antitrust analysis, geography plays an important part. In the reality of Puerto Rico, a doctor, a physician who has license to work throughout Puerto Rico, there's no harm there because the size of this island, this plaintiff, it's not like moving from Massachusetts to California or vice versa. That's why we say, and as Professor Yadó indicated, the proper market is the entire Puerto Rico because their license, the seller's license as well as my client's license, allows them to provide services in San Juan, Ponce, in other parts of Puerto Rico. That's why there's no obliteration of competition as the plaintiff wanted to believe. If I may continue on my exclusive primary jurisdiction argument. That's time. Okay. I will take that on the briefs. I ask my colleagues if they have any further questions for you. Okay. Thank you. Thank you, Your Honor. Thank you. At this time, would Attorney Alcover please mute his audio and video? And Attorney Martinez, you have a three-minute rebuttal. Yes. Thank you. Jorge Martinez again for the appellants. I wish to begin addressing some of the my last brothers who argued. First of all, his client is being sued by everyone. As per paragraph 2.17 of the amended complaint, plaintiffs wish to stress that only Dr. Juan M. Colón-Rivera, Urocentre, CSP, and Roberto Vasquez-Ramos are asserting claims against MSO. The remaining plaintiffs are suing only Triple S Salud, Hector Rodríguez-Plazas, and his entities. So everybody is suing those defendants. Also, your counsel just tried to equate the proceeding of physical castration to chemical castration. Physical castration is much cheaper, and the patient loses his testicles forever. Chemical castration is more expensive, but the patient keeps his condition, then he goes off the therapy, and he has normal hormonal output. So we believe that those two things are very, very, very different from one another. Also, the argument that it's the struggle that is being made that, for some reason, this is a case that needs to be brought by patients who have been hurt by subpar services that result from these exclusivity agreements. Well, my clients are competitors that are no longer being allowed to compete. So I don't know if there's a competition of who's the better plaintiff, but certainly my clients are plaintiffs that are entitled to seek relief under antitrust law. And it would be absurd to say that my clients need, or that the patients even, could assert a violation of the Chairman Act before the agency that administers the government's health insurance plan. Also, during the last minutes, we heard that the way that the services in the western area were changed or altered was due to lower prices. The consumers in this scenario are the patients who do not pay for their medical insurance plan because this is medical insurance for the indigent. So they don't pay any premiums. They didn't pay any premiums before the exclusive arrangement. They don't pay any premiums now. So there is no affectation of costs, only costs to the defendants. And as a matter of fact, the argument in both instances, we have patients of limited economic resources that live in Puerto Rico's western area. And we have patients of advanced age, 65 plus, is considered under the low advanced age for purposes of Medicare, that defendants' solution and the market that they would like to argue is, well, there's some urologists in Ponce and some in Fajardo and some in San Juan, so they should just get an appointment with those urologists. Well, that is difficult for, and it's a reasonable inference that the court should take at this moment, that that would be... That's time. That would be quite difficult for the patients in this case. Thank you, Your Honor. Thank you. Thank you all. That concludes argument in this case. Attorney Martinez, Attorney Roman, Attorney Yaddo, and Attorney Alcover, you should disconnect from the hearing at this time.